MaddeN, Judge,
delivered the opinion of the court:
This is a congressional reference case, which is before us pursuant to the provisions of 28 U.S.C. §§ 1492 and 2509. The plaintiff is a municipal corporation in the County of Passaic, in New Jersey. In 1957, a bill, H.R. 9392, 85th Cong., 1st Sess., was introduced in the House of Representatives proposing to pay to the plaintiff borough $146,133.08 because of certain taxes which the Borough claimed that the United States should have paid to the Borough. On July 21, 1958, the House of Representatives passed House Resolution 600, 85th Cong., 2d Sess., referring the pending *73 bill to this court, as the House was authorized to do by the Code sections cited above. Our task is to inform the House as to the nature and character of the Borough’s claim and the amount, if any, legally or equitably due from the United States to the Borough.
The facts of the case are not disputed. They were found by a commissioner of this court, after a trial, and we have adopted the commissioner’s findings without significant alterations.
In and long before the year 1942 there was in the Borough of Bingwood a property of some 900 acres known as the Bingwood Iron Mines. It contained two known ore deposits, 65 buildings for the operation of the mines and 97 houses for mine workers. In 1942 the Defense Plant Corporation (DPC), a subsidiary of the Beconstruction Finance Corporation (BFC), both of which corporations were wholly owned by the United States, bought the property. The DPC rehabilitated the property and operated it for war production purposes until about 1950. BFC paid the taxes assessed by the plaintiff during the years 1942-1950 as it was required to do by section 607 of Title 15 of the United States Code.
In 1950 the property in question was declared surplus and was transferred by BFC and DPC to the United States. In 1951 the United States transferred the property to Bing-wood Iron Mines Inc., a private corporation. The sale price was $1,500,000. The purchaser paid $100,000 cash and gave a mortgage back to the United States to secure its note payable in annual installments, with interest. The purchaser corporation was not successful. It made only one partial payment of its annual installments to the United States. The Borough, of course, assessed the taxes on the property to the purchaser, and the purchaser paid them for the years 1951, 1952 and part of 1953. It failed to pay the taxes for a part of the year 1953 and for the years 1954-1957. Those unpaid taxes amounted to $146,133.08, the amount in question in this proceeding.
As to the annual installments owed by the purchaser to the United States on its mortgage note, the United States was lenient, hoping that the purchaser would obtain new financing and get the enterprise on a paying basis. Finally, how *74 ever, the purchaser gave notice that it could not carry on, and the United States foreclosed its mortgage. The United States District Court for the Distinct of New Jersey held that the mortgage lien of the United States was superior to the tax lien of the plaintiff Borough. 151 F. Supp. 421. This decision was affirmed by the United States Court of Appeals for the Third Circuit. 251 F. 2d 145. The Supreme Court of the United States denied certiorari on June 2, 1958. 356 U.S. 974.
The United States on December 4,1956, bid in the property at the foreclosure sale for the amount remaining due on its mortgage note, with accrued interest. That amount was $1,685,367.43. In December 1958, the United States sold the property to the Pittsburgh Pacific Company for $650,000.
Congress recognized that when RFC, which paid taxes on the property which it owned, transferred property to the United States, whose property was not subject to state and local taxes, a hardship was imposed upon municipal taxing bodies. By the Act of August 12, 1955, 69 Stat. 722, Congress added the following provision to the Act of June 30, 1949, 40 U.S.C. § 523 (Supp. IV, 1952) :
Where real property has been transferred on or after January 1, 1946, from the Reconstruction Finance Corporation to any Government department, and the title to such real property has been held by the United States continuously since such transfer, then on each date occurring on or after January 1, 1955, and prior to January 1, 1959, on which real property taxes levied by any State or local taxing authority with respect to any period become due, the Government department which has custody and control of such real property shall pay to the appropriate State and local taxing authorities an amount equal to the amount of the real property tax which would be payable to each such State or local taxing authority on such date if legal title to such real property had been held by a private citizen on such date and during all periods to which such date relates. (Emphasis supplied).
The plaintiff relies upon the quoted statute. The reliance seems to be misplaced. In any event, the statute would not apply to any taxes due before January 1, 1955, and hence would not cover the part of the plaintiff’s claim which relates *75 to taxes for 1953 and 1954. But the statute also requires that the property be held continuously by the United States, after it acquires it from the RFC, until the tax date in 1955 or thereafter. In the instant case the RFC transferred the property to the United States in 1950, but the United States transferred the property to Ringwood Iron Mines, Inc., a private purchaser, in 1951.
The plaintiff has an answer to the problem posed by the word “continuously.” It says that when the United States made its deed to the private purchaser in 1951 it took back a mortgage upon the property sold, and thereby continued to keep the “title” to the property.
Early common law regarded a mortgage as placing legal title in the mortgagee subject to a conditional estate in the mortgagor which would shift the title to him upon the strict performance of the condition, viz., the payment of the debt on the due date. That concept of a mortgage is not accepted in New Jersey. East Rutherford & c. Assoc. v. Neblo, 101 N.J. Eq. 561, 139 Atl. 172. When the United States in 1951 made its deed to Ringwood Iron Mines, Inc., it parted with its “title” to the property in every significant sense. It ceased to be the equitable owner of the property. If by reason of inflation or new discoveries of ore the property had greatly increased in value, the United States would have had no right to share in that increase. It likewise had no legal title. It had no right to possession of the property and its entry on it would have been a trespass, unless permitted by some term of its mortgage. The United States had nothing but a lien to secure the payment of the promised purchase price. It had no more title, legal or equitable, than a banker would have had if he had loaned the purchaser the money to pay for the property, and had taken a mortgage on the property to secure the loan. The statute relied on by the plaintiff is not applicable, either in letter or in spirit.
Most of the evidence taken in the case, and many of our findings, have to do with the unfortunate consequences of the failure of the successor owner of the property to operate it profitably. We are not advised whether that failure was due to bad management, or to the conditions of the market for its products, or to some other reason. It was not due to *76 any fault or omission of the United States. The United States had acquired the property for production for war purposes. In 1950 it had no further use for the property. Obviously, the prudent thing to do was to seil it, if it could find a purchaser. It would be remarkable if it could not do so without undertaking to guarantee that its purchaser would, for the indefinite future, pay his taxes, maintain the property so that it would justify a high assessment for tax purposes, give continuous employment to the inhabitants of the area and, in general, be a valuable asset to the community.
We suppose that many taxing bodies throughout the United States have suffered adverse effects from the closing down of war-time operations which had been carried on by the United States or by private enterprises. Perhaps the plaintiff Borough’s situation is unusual in that the single enterprise here involved was so relatively large and important a taxpayer, in the plaintiff’s small community. That difference in degree, but not in kind, from other adversely affected communities could hardly be a sound foundation for a legal or equitable claim against the United States.
We respectfully report to the Congress that, in our opinion, the Borough of Ringwood has no valid claim, legal or equitable, against the United States.
The Clerk will certify to the Congress pursuant to H. Res. 600, 85th Cong., 2d Sess., this opinion together with the findings which follow.
It is so ordered.
Reed, Justice {Bet.); sitting by designation; Dureee, Judge/ LaRamoee, Judge, and Jones, OMef Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a municipal corporation, and as such a taxing district, comprised of a rural and residential community located in the northern part of Passaic County, New Jersey.
2. On August 21, 1957, H.R. 9392, 85th Cong., 1st Sess., entitled “A Bill For the relief of the borough of Ringwood *77 in the county of Passaic, New Jersey,” was introduced in the House of Representatives, proposing legislation as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the borough of Ringwood in the county of Passaic, New Jersey, the sum of $146,133.08. The payment of such sum shall be in full settlement of all claims of the borough of Ring-wood against the United States for taxes, and interest thereon, for the calendar years 1953, 1954, 1955, 1956, and 1957 with respect to certain real and personal property located in the borough of Ringwood (commonly known as the Ringwood iron mine property) to which title has been acquired by the United States. No part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
On July 21, 1958, H.R. 9392 was, by action of the House of Representatives in passing H. Res. 600, referred to this Court for a “report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.”
3. Properties known as the Ringwood iron mines, consisting of six separately described tracts of land, containing about 900 acres, two known ore deposits, together with 65 mine buildings, including warehouses, machine shops, and office building, buildings for the production and shipment of iron ore, and 97 houses for workers, are located in the Borough of Ringwood.
*78 4. In 1942, the Defense Plant Corporation, hereinafter referred, to as D.P.C., a subsidiary of Deconstruction Finance Corporation, both corporations wholly owned by the defendant, acquired the Kingwood iron mines properties. The mines and mine 'buildings were in need of rehabilitation, and D.P.C. installed new drilling machines, scrapers, mine cars, locomotives, pumps, and other equipment. The 97 frame dwellings, containing over 100 family units, were estimated to be 40 to 50 years old at the time of the trial of this case in May 1959, and 90 percent of them had no indoor sanitary facilities. Until the operations in. the mines ceased in 1954, these houses were in fair condition, but thereafter depreciated considerably both from the standpoint of interior and exterior repairs.
5. The properties were operated by D.P.C. for war production purposes from 1942 to about 1950. During these years, the properties were assessed for taxes by the plaintiff in the name of the predecessor owner, Kingwood Company, for 1942 and 1943, in the name of D.P.C. for the years 1944 through 1949, and in the name of War Assets Administration for 1950. Deconstruction Finance Corporation paid the assessed taxes for these years.
6. In 1950, the properties were declared surplus pursuant to the Federal Property and Administrative Services Act of 1949, 63 Stat. 377, and by deed dated February 13, 1950, duly recorded with the Kegister of Passaic County, New Jersey, Reconstruction Finance Corporation and D.P.C. conveyed the Kingwood iron mines properties to the United States, pursuant to executive orders and administrative regulations then in force.
7. By bill of sale and by deed, both dated August 14,1951, and duly recorded, the United States through its General Services Administration sold and conveyed all of these mining properties, both real and personal, to Kingwood Iron Mines, Inc., a privately owned New Jersey corporation.
8. The sale price was $1,500,000, one hundred thousand dollars of which was paid by Kingwood Iron Mines, Inc., in cash. This purchaser executed and delivered a note payable in annual installments in favor of the United States for the balance of the purchase price, and executed and delivered *79 a mortgage on all of the properties both real and personal, to secure the payment of the balance. The mortgage was also duly recorded.
9. The dwelling houses, covered by the deed and described in the mortgage, were subject to individual leases between the United States and the respective tenants, providing rentals on each house, varying from $6 to $20 per month, with most rentals $8 or $10 per month. As a part of the overall transaction, the reversionary interests of the United States in these leases were assigned on August 14, 1951, by the United States to the Bingwood Iron Mines, Inc.
10. The purchase money mortgage imposed a lien on all of the property, both real and personal, in favor of the United States, and among other things, provided that
(a) should any default be made in the payment of any interest or installment of principal, or upon any tax, assessment or other municipal or governmental rate or charge, the entire amount of the indebtedness should become due and payable,
(b) in the event of default in the payment of any taxes, insurance premiums and other charges, the United States should have the right to pay those charges at its option,
(c) the mortgagor should keep the premises in good repair and not allow taxes to become in default, and
(d) the United States should have the right, in the event of default in the terms of the mortgage, to enter upon and take possession of the premises and to receive the rents, issues and profits therefrom.
11. The operation of the mines by Bingwood Iron Mines, Inc., was not successful and, as a result, liabilities were incurred and unpaid by that company to the extent that by 1955 it was unable to carry on further operations.
During the years 1951 through 1957, plaintiff assessed taxes on the mines properties in the name of Bingwood Iron Mines, Inc., and the Bingwood company paid the taxes for 1951 and 1952 and part of the taxes for 1953, but none for 1954 through 1957.
The total amount of unpaid taxes for the unpaid balance of 1953 and for the years 1954 through 1957, with interest to *80 March. 31, 1958, is the sum of $146,133.08, and these taxes hare never been paid.
12. The first payment on the purchase money note and mortgage, representing interest only, was due in the sum of $50,000 on February 14, 1953. The company paid only $35,000 of that sum. No other payments were made on the note and mortgage.
13. On March 5,1954, defendant agreed to defer the $15,000 unpaid balance on the first payment from Bingwood Iron Mines, Inc., and also to defer payment of the instalment of principal and interest of $150,000 defaulted on February 14,1954. On December 31,1954, defendant entered into another agreement with the Bingwood company, by the terms of which the payments provided for in the original note were further modified and amended and previous delinquencies by the Bingwood company were excused, with the understanding and upon the representation of the Bingwood company that new capital was to be provided.
The extension agreement of December 31,1954, was further amended on August 6,1955, but the Bingwood company again defaulted. On October 6, 1955, defendant again extended the time for payment by the Bingwood company until March 31,1956, but again a default occurred.
Between October 20, 1955, and October 26,1955, all insurance covering the mining properties was canceled by the insurance carriers.
14. On November 1, 1955, an inspection of the mines by General Services Administration revealed that the properties were not being properly maintained by the Bingwood Iron Mines, Inc. The defendant was not at fault in respect of the maintenance of the mines or cancellation of the insurance policies. On November 16, 1955, defendant was informed by the Bingwood company that it was unable to carry on further operations, and on November 30, 1955, notice was given to defendant by the company that the company was unable to continue to employ personnel on the properties after December 2,1955.
On December 2, 1955, defendant by its General Services Administration, with permission having been obtained from *81 the Ringwood company, installed its own personnel to provide protection and maintenance of the properties.
15. By an instrument dated November 29,1955, the Ring-wood Iron Mines, Inc. waived notice in writing by defendant of the default of the mortgage and consented to the institution of foreclosure proceedings.
On December 30, 1955, a purported public auction sale of the properties was held by plaintiff for delinquent municipal taxes assessed for the years 1953 and 1954, and plaintiff’s Collector of Taxes purportedly sold the properties to plaintiff, subject to the equity of redemption. Certificates of sale for unpaid taxes were issued to plaintiff.
16. On January 23, 1956, defendant instituted a suit entitled United States of America v. Ringwood Iron Mines, Inc. and the Borough of Ringwood, Civil No. 35-56, in the United States District Court for the District of New Jersey, to foreclose the mortgage lien on the properties. The United States also sought the appointment of a “receiver of rent, issues and profits of lands and chattels thereon with all powers that may be proper for that purpose.” A custodial receiver was appointed by the court on February 7, 1956, and he acted in such capacity until his discharge by court order on March 15,1957.
17. On July 2, 1956, judgment in the sum of $1,659,139.04 was entered in favor of the United States in the mortgage foreclosure suit. The court ordered that the mining properties to be sold and that the United States be entitled to have the amount of the judgment paid out of the proceeds of the sale.
Pursuant to the judgment, the mortgaged properties were sold by the United States Marshal on December 4, 1956. The court order confirming the sale was entered on December 14, 1956. The United States was the sole bidder at the sale and purchased the properties for the sum of $1,685,36743.
18. The judgment of July 2, 1956, was entered subject to a stipulation between the Borough of Ringwood and the United States to the effect that the issue of priority of liens between the United States and the Borough of Ringwood should be thereafter decided by the District Court. After *82 presentation of the issue on motion of the United States, the District Court on May 8, 1957, entered its opinion, reported at 151 F. Supp. 421, and decided that the mortgage lien in favor of the United States was prior to the lien for taxes asserted by the Borough of Eingwood, and an order in accordance with the opinion was entered by the court on May 12,1957.
On January 20,1958, The United States Court of Appeals for the Third Circuit, on the appeal of the Borough, affirmed the order and judgment of the lower court, the opinion being reported at 251F. 2d 145.
On June 2, 1958, the Supreme Court of the United States denied the Borough’s petition for a writ of certiorari in the case. 356 U.S. 974.
19. During the years 1953 through 1957, the assessed valuation of the Eingwood iron mines properties was the second largest of all tax accounts in the Borough, the largest being that of the North Jersey District Water Supply Commission. The following table shows for each of these years the total assessed valuation of the Eingwood iron mines properties, the total assessed valuation of all taxable properties in the Borough, and the percentage relationship between the two valuations:

In the fall of 1956 the Borough hired an independent appraising firm and conducted a general tax revaluation survey. The 1957 assessed valuation of the mines properties was fixed as a result of this program. The substantial decrease in assessed valuation for that year over prior years was due in part to deterioration of buildings and to a substantial degree because the two mines had been flooded by torrential rains *83 in 1954 with the result that mining machinery and equipment therein were rendered valueless. The mines were still partly flooded in 1957.
20. The taxes collected by the Borough are and were for three governmental functions: operation of public schools, for payment by the Borough of its share of the county tax, and for operation of municipal government of the Borough. Eegardless of the extent of tax delinquencies, plaintiff was required to pay the full amount of the taxes assessed for the schools and the county. Substantial delinquencies in collection of taxes for one year are made up by plaintiff by increasing its tax rate in the next year. The failure of plaintiff to collect the taxes on the mines properties for the years 1953 through 1957 resulted in percentage tax increases on each of its taxpayers of 9.90, 9.30, 8.48, 7.95, and 3.68 in the succeeding years.
In the years 1950 through 1957, the tax collections of the sixteen municipalities in Passaic County, New Jersey, varied between an annual average of 92.19 and 93.3 percent of the assessed taxes each year. In 1950 and 1951, plaintiff’s percentages of tax collections were respectively 93.85 and 90.97 percent. Thereafter, its percentages of tax collections were as follows: 81.18 for 1952; 79.92 for 1953; 79.53 for 1954; 81.41 for 1955; 81.69 for 1956; and 84.15 for 1957. The low percentages of tax collections of plaintiff for the years 1953 through 1957 resulted mainly from the non-payment of taxes on the mines properties.
These low percentages of tax collections have adversely affected plaintiff’s credit rating and made it liable to pay higher interest rates on its bond issues.
21. The non-payment of the taxes on mines properties was a contributing factor in the increased tax rates for the Borough. In 1950, 1951, and 1952, these rates per $100 of assessed valuation were respectively, 4.97, 4.86, and 4.91. Thereafter, the rates were 5.40 for 1953; 5.58 for 1954; 5.97 for 1955; 8.73 for 1956; 8.96 for 1957; and 9.36 for 1958.
The breakdown of these total tax rates for each of the years 1953 through 1957 shows the following rates adopted for each of the three tax collection purposes:

*84

Based on tbe foregoing rates tbe following are tbe taxes levied against tbe mines properties in tbe name of Ringwood Iron Mines, Inc., as allocated to tbe specific purposes:

Only part of these 1953 taxes were paid, and none for 1954 through 1957, but plaintiff was required through these years on account of the allocation of such taxes to pay the total sum of $59,122.88 to the local schools and the total sum of $26,166.25 to the County of Passaic.
22. During the school years 1952-53 through 1957-58, plaintiff’s taxpayers were required to defray costs with respect to the public education of children residing on the mines properties, as follows: $47,600.10 for 1952-53; $47,044.18 for 1953-54; $60,422.28 for 1954^55; $67,281.02 for 1955-56; $71,640.87 for 1956-57; and $81,127.95 for 1957-58. The United States contributed to these costs only for the years 1956-57 and 1957-58, and such contributions, received by the local board of education in 1958, were in the respective sums of $11,584.49 and $17,635.80, thus reducing the cost to plaintiff’s taxpayers for the years 1956-57 and 1957-58 to the respective sums of $60,056.38 and $63,492.15.
23. The increase in tax rates was in part due to the increase in amounts spent by plaintiff for public assistance due to unemployment resulting from the curtailment of mining operations or the closing of the mines. During the years 1953 *85 through 1958, the amounts expended by plaintiff for public assistance has been as follows: $2,143 for 1953; $7,783 for 1954; $12,637 for 1955; $6,630 for 1956; and $6,525 for 1957. The number of families on relief has varied from 4 to 38 units. About 90 percent of this assistance was granted to families residing in the dwellings on the mines properties.
24. Throughout the tax years involved in this case, plaintiff was required to provide in the residential area of the mines properties health services, garbage and trash removal, and other public services related to control of communicable diseases. There was also a high rate of municipal law enforcement problems and plaintiff also incurred costs for road repairs and snow-plow services in the residential area of the mines properties.
25. There was considerable deterioration of the mines properties after 1950 and particularly in the years 1954 through 1957. After the flooding of the mines in August 1954, no steps were taken for about a year to remove the water, and much of the machinery and equipment in the mines became worthless. The mines buildings and the dwelling houses also deteriorated substantially.
The General Services Administration made periodic inspection of the mines properties during the years 1953 through 1956 and requested the Kingwood Iron Mines, Inc. to make necessary repairs, but the financial conditions of that company did not permit adequate maintenance of the properties.
During the period December 1955 through July 1958, General Services Administration spent the total sum of $191,-896.73 for salaries, supplies, materials, fuel and. utilities, and contractual maintenance on repairs to preserve and protect the mines properties. Of the total expenditures, the sum of $126,700 was spent by General Services Administration for the salaries of a superintendent, four employees, and three guards on the properties.
26. In December 1958, the United States sold and conveyed the mines properties to the Pittsburgh Pacific Company for a total price of $650,000.
At the time of the purchase of the properties by the Pittsburgh company, plaintiff’s assessed valuation of the prop *86 erties was $301,775. By procedures provided 'by the statutory law of New Jersey, this company succeeded in having the assessed valuation reduced to $198,850, and this assessed valuation was based on the $650,000 sale price.
27. Of the $146,133.08 of taxes unpaid for the years 1953 through 1957 on the mines properties, $24,034.64 represented the taxes plus penalties assessed for the year 1957. The 1957 assessment was made on October 1, 1956, and was not canceled even though the United States acquired title to the properties pursuant to the foreclosure proceedings in December 1956, and held the title throughout the year 1957.